602 F.2d 1363
 102 L.R.R.M. (BNA) 2571, 86 Lab.Cas. P 11,531
 In the Matter of the Arbitration of: AMALGAMATED CLOTHING
AND TEXTILE WORKERS UNION, AFL-CIO-CLC and Southern
California Joint Board of the Amalgamated Clothing and
Textile Workers Union, AFL-CIO, Petitioners- Appellants,
v.
RATNER CORPORATION, a California Corporation, Respondent-Appellee.
 No. 77-2753.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 27, 1979.
 
 George Kaufmann, Washington, D. C. (argued), Arthur M. Goldberg, and Robert Tim Brown, New York City, on brief, for petitioners-appellants.
 Erwin Lerten, Beverly Hills, Cal., for respondent-appellee.
 Appeal from the United States District Court for the Southern District of California.
 Before CARTER and WRIGHT, Circuit Judges, and SOLOMON, Senior District Judge.*
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 The Amalgamated Clothing & Textile Workers Union (Union) appeals from the denial of its petition to compel arbitration with Ratner Corporation regarding coverage of a no-subcontracting clause in its collective bargaining agreement. We have jurisdiction under 28 U.S.C. § 1291 and we reverse.
 
 FACTS
 
 2
 Ratner Manufacturing Company was a closely held corporation owned and operated by members of the Ratner family and their spouses. It was primarily engaged in the production and sale of men's clothing. Stanley E. Foster was its president. Before 1972, family members also owned California Clothing Corporation, Vista Slack Corporation, and Arizona Slack Corporation, all of which manufactures clothing solely for Ratner Manufacturing.
 
 
 3
 Ratner Manufacturing's relationship with the Union dates from 1968. On June 1, 1971, these parties signed a collective bargaining agreement which contained these clauses:
 
 14. GRIEVANCE AND ARBITRATION PROCEDURE:
 
 4
 All complaints, grievances or disputes arising between the parties hereto relating directly or indirectly to the provisions of this Agreement shall in the first instance be taken up for adjustment by a representative of the Union and a representative of the Employer. In the event they are unable to adjust same then such matter shall be submitted to an arbitrator mutually agreed upon by the parties. Any and all matters in dispute, including a dispute concerning the interpretation or application of the arbitration provision, which have not been adjusted pursuant to the procedure therein provided, shall be referred for arbitration. In the event the parties hereto are unable to agree on an arbitrator, each party shall appoint an arbitrator and the two so appointed shall select a third. The decision of the arbitrator shall be final and binding.
 
 17. OTHER FACTORIES:
 
 5
 A. During the term of this Agreement the Employer may, with the consent of the Union, manufacture garments (including coat fronts) or cause them to be manufactured for his own business use in a factory other than his present factory or factories provided his factory or factories have and continue to have full employment and provided further that such other factory or factories are under contract with the Union.
 
 
 6
 B. During the term of this Agreement the Employer agrees that he shall not, without the consent of the Union, remove or cause to be removed his present plant or plants from the city or cities in which such plant or plants are located.
 
 
 7
 C. The Employer further agrees that he shall send work only to such Union contractors designated by agreement of the parties herein. The Employer employing contractors agrees simultaneously with the execution of this Agreement to execute a contractor registration statement, the terms and conditions of which shall be specifically incorporated herein by reference.
 
 
 8
 D. It is agreed that imports are within the scope of this Article.
 
 
 9
 In November 1971, Ratner Manufacturing acquired Towne & King, Inc., a company which sells clothing manufactured by others. In December 1971, it acquired the "Hang Ten" trademark and on January 1972, formed a new subsidiary, Hang Ten International.
 
 
 10
 On March 29, 1972, Ratner Manufacturing underwent a corporate reorganization. It changed its name to Ratner Corporation and formed a new, wholly-owned subsidiary, Ratner Clothes Corporation (Ratner Clothes). It transferred to Ratner Clothes all manufacturing facilities and assets of Ratner Manufacturing, except for its two subsidiaries, Towne & King, Inc. and Hang Ten International. Ratner Clothes then acquired California Clothing Corporation, which had previously acquired Arizona Slack Corporation. Ratner Corporation subsequently purchased 52% Of the stock of Unique Slacks 'N Jeans, a company which subcontracted manufacturing.
 
 
 11
 Before the reorganization, Ratner Manufacturing had combined in one company manufacturing, selling, and the ownership of subsidiaries. After the reorganization, manufacturing and sales were consigned to the several subsidiaries and Ratner Corporation became exclusively a holding company. In December 1973, the new Ratner Clothes Corporation contracted with BAW Manufacturing Company, a Texas corporation, to manufacture slacks for Ratner Clothes.
 
 
 12
 On June 1, 1974, after Ratner Manufacturing had changed its name to Ratner Corporation, it entered into another collective bargaining agreement with the Union. Stanley E. Foster, who had signed the 1971 agreement, signed the subsequent agreement, as president of Ratner Manufacturing. The 1974 agreement was negotiated by Raymond Pagano who also had negotiated the 1971 agreement. Neither Foster nor Pagano referred to Ratner Manufacturing's name change or to its corporate reorganization.
 
 
 13
 The 1974 agreement contained an identical "Other Factories" clause governing subcontracting by the employer and a similar, but not identical, arbitration clause. The new clause omitted the language which made arbitrable disputes over the interpretation or application of the arbitration clause itself.[1]
 
 16. GRIEVANCE AND ARBITRATION PROCEDURE:
 
 14
 In October 1975, the Union sent a notice of arbitration to Ratner Manufacturing asserting a violation of sections A and C of the no-subcontracting provision by
 
 
 15
 manufacturing or causing to be manufactured garments within the scope of the collective bargaining agreement in non-union facilities.
 
 
 16
 Stanley Foster, now the president of Ratner Corporation, responded:
 
 
 17
 I am quite puzzled by this letter since Ratner Corporation does not have a contract with your union.
 
 
 18
 Because Ratner Corporation refused to arbitrate, the Union sued under § 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a) (1976), to compel arbitration under the contract. The trial judge viewed the suit as an attempt by the Union to impose the terms of its collective bargaining agreements with Ratner Manufacturing upon two of Ratner Corporation's subsidiaries, Towne & King, Inc. and Unique Slacks 'N Jeans.
 
 
 19
 The judge considered the overall bargaining history between the parties and noted that the Union had entered into separate bargaining agreements with Ratner subsidiaries while contracting with Ratner Manufacturing. He concluded that the parties had never intended the agreements with Ratner Manufacturing to bind all Ratner subsidiaries and denied the petition to compel arbitration.
 
 
 20
 We believe that the appellee misstates, and the trial court misconstrued, the issue. The question is not
 
 
 21
 (w)hether a collective bargaining agreement with one subsidiary of a holding company is applicable to other subsidiaries of the same holding company when the labor organization involved does not now, nor has it ever represented any of the employees of the subsidiaries to which it wishes to extend the collective bargaining agreement.
 
 
 22
 The Union expressly disavows any intent to impose its contracts with Ratner Manufacturing upon the Ratner subsidiaries. It argues only that Ratner Corporation is bound by the two agreements. The principal question, then, is whether the collective bargaining agreements signed by Ratner Manufacturing bind Ratner Corporation. If they do, we must determine whether the dispute over subcontracting is within the scope of the arbitration clauses.
 
 
 23
 We conclude that Ratner Corporation is bound by both the 1971 and 1974 agreements, and that the question whether it violated the no-subcontracting provision either directly or through its subsidiaries is within the scope of their respective arbitration clauses.
 
 THE PARTIES
 
 24
 Whether parties are bound by a collective bargaining agreement is initially a question for the courts. Las Vegas Local Joint Executive Board v. Las Vegas Hacienda, Inc., 383 F.2d 667, 668 (9th Cir. 1967). The court, not an arbitrator, must decide whether an entity is bound by the arbitration clause in a collective bargaining agreement which it did not sign.
 
 The Supreme Court has explained:
 
 25
 (t)he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so A fortiori, it cannot be compelled to arbitrate if an arbitration clause does not bind it at all.
 
 
 26
 John Wiley & Sons v. Livingston, 376 U.S. 543, 547, 84 S.Ct. 909, 913, 11 L.Ed.2d 898 (1964).
 
 
 27
 In John Wiley, Interscience, which had a contract with the Union, merged with John Wiley. The merger was apparently for valid business purposes. Wiley retained most of the Interscience employees, but had no contract with the Union. The Union did not assert that it represented all Wiley employees, only those originally covered by the Interscience agreement. There, as here, the Union petitioned to compel arbitration under § 301 of the LMRA. At issue was whether the Interscience agreement compelled Wiley to arbitrate the effect of the merger on the retained employees.
 
 
 28
 The Court held that Wiley was required to submit to arbitration. It reasoned that
 
 
 29
 (i)t would derogate from "the federal policy of settling labor disputes by arbitration," United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, (80 S.Ct. 1358, 4 L.Ed.2d 1424) if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established; . . . .
 
 
 30
 376 U.S. at 549, 84 S.Ct. at 914.
 
 
 31
 The Court was careful to state that the duty to arbitrate would not necessarily survive "every case in which the ownership or corporate structure of an enterprise is changed." Id. at 551, 84 S.Ct. 909, 915. There, it found
 
 
 32
 relevant similarity and continuity of operation across the change in ownership . . . adequately evidence by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty.
 
 
 33
 Id. In addition, the Union had asserted its right to arbitrate at the outset and could not be said to have abandoned its claims.
 
 
 34
 In Howard Johnson Co. v. Detroit Local Joint Executive Bd., 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), a more recent case involving a Union's suit to compel arbitration under § 301, the Court elaborated on the successorship principles of John Wiley. The Howard Johnson Co. had purchased the assets of a restaurant and motor lodge but hired only a few of its predecessor's employees. The Union asserted that Howard Johnson was subject to an arbitration clause in its collective bargaining agreement with the predecessor. It sought to arbitrate the question whether the new owner was bound by that agreement to hire all of its predecessor's employees.
 
 
 35
 The Court found Wiley distinguishable because there the initial employer completely disappeared. It stated:
 
 
 36
 (T)he disappearance of the original employing entity in the Wiley merger meant that unless the union were afforded some remedy against Wiley, it would have no means to enforce the obligations voluntarily undertaken by the merged corporation, to the extent that those obligations vested prior to the merger or to the extent that its promises were intended to survive a change of ownership.
 
 
 37
 417 U.S. at 257, 94 S.Ct. at 2241. In contrast, because Howard Johnson's predecessors continued in existence "as viable corporate entities, with substantial revenues," 417 U.S. at 257, 94 S.Ct. at 2241, the Union could enforce its contract rights against them.
 
 
 38
 Neither John Wiley nor Howard Johnson is on all fours with this case. Ratner Manufacturing did not merge with an independent business entity nor was it purchased by one. It became Ratner Corporation, then transferred its manufacturing operations to a new subsidiary. This case is an even stronger one for imposition of the duty to arbitrate than the two successorship cases.
 
 
 39
 Ratner Manufacturing originally manufactured garments and utilized related companies to manufacture them. The two collective bargaining agreements clearly contemplate that the employing entity would both manufacture garments and have them made in other plants.
 
 
 40
 The agreements purport to cover only those persons employed directly by Ratner Manufacturing. The no-subcontracting provisions protect those employees from removal of work from the bargaining unit. They provide that the employer can utilize other factories for manufacturing only if (1) its factories have full employment and (2) the other factories are under contract with the Union. The arbitration clauses were also included to protect the manufacturing employees' rights under the agreements.
 
 
 41
 The effect of the reorganization was to divest the parent company of its manufacturing operations and to place them within the control of its subsidiary, Ratner Clothes Corporation. After the relinquishment, Ratner Corporation could perform manufacturing only indirectly, through its subsidiaries. Ratner Clothes Corporation is the only Ratner subsidiary actually involved in manufacturing. It employs all personnel covered by the original collective bargaining agreement.
 
 
 42
 The parent argues that its subsidiary, Ratner Clothes, is the logical successor to Ratner Manufacturing's obligations under the 1971 agreement. With respect to the 1974 agreement it maintains that, because Ratner Manufacturing ceased to exist in 1972, Foster's signature for Ratner Manufacturing was, at best, ambiguous. He was president of both Ratner Corporation and Ratner Clothes Corporation and presumably could bind either.
 
 
 43
 Because the subsidiary actually employed the workers covered by the contract, and because the Union had a history of separate bargaining agreements with related Ratner corporations, the parent argues that the parties intended the 1974 contract to bind only the subsidiary. We are unpersuaded.
 
 
 44
 The 1971 Agreement.
 
 
 45
 The 1971 agreement contains a successorship clause which provides:In the event the Employer merges or consolidates with, or its business is acquired by another person, firm or corporation, the Employer shall remain bound by all of the terms and provisions of this Agreement for the full term hereof.
 
 
 46
 This clause clearly evidences the parties' intent that the original employer remain bound by the terms of the agreements. In the case of an acquisition, it does not impose those obligations upon the acquiring company, but upon its predecessor. Nothing in the clause indicates that the original employing entity would cease to be bound only because it ceased to be the employer.
 
 
 47
 Here, Ratner Manufacturing merely changed its name by amending its articles of incorporation and filing the change with the state. Thus Ratner Corporation was the same company as Ratner Manufacturing, albeit with a different function. It could not escape its contract obligations by creating a subsidiary to take over its manufacturing operations. Even though it no longer directly employed the personnel covered by the contract, it remained bound by it as it would be in the event of a sale of its manufacturing plant to another company.
 
 
 48
 There is another reason to hold that Ratner Corporation, and not its subsidiary, is bound by the contract. If the subsidiary only were bound, the protection bargained for in the "Other Factories" clause would be seriously diluted.
 
 
 49
 The parent, Ratner Corporation, could subcontract free of the restrictions imposed by the "Other Factories" provision, and of the duty to arbitrate. The "Other Factories" clause would provide substantially less protection as applied to the new subsidiary because, as a result of the reorganization, the other subsidiaries of the parent could do most of the subcontracting. The parent would have escaped the obligations it originally undertook as Ratner Manufacturing by the simple expedient of reorganizing its corporate structure.
 
 
 50
 We also believe that "(i)t would derogate from 'the federal policy of settling labor disputes by arbitration' " if this change in the company's corporate structure were to negate the duty to arbitrate which it voluntarily assumed as Ratner Manufacturing. John Wiley, 376 U.S. at 549, 84 S.Ct. at 914, Quoting United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).
 
 
 51
 The 1974 Agreement.
 
 
 52
 By 1974, Ratner Manufacturing no longer existed. When Foster signed the agreement as Ratner Manufacturing's president, he knew of the ambiguity it created, but made no effort to apprise the Union of the reorganization. The identity of the contracting corporation was clearly material. It affected the degree of protection afforded the manufacturing employees under the contract, especially with respect to the no-subcontracting clause.
 
 It is well-established that
 
 53
 where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage.
 
 
 54
 Union Mutual Insurance Co. v. Wilkinson, 80 U.S. (13 Wall) 222, 233, 20 L.Ed. 617 (1872); See generally 13 Williston on Contracts § 1536 (3d ed. 1970).
 
 
 55
 Here, Foster as president created the ambiguity which gave the company an unfair advantage in the contract negotiations. He knew of the existence of the new subsidiary, Ratner Clothes, and of his dual capacity as president of the parent and of the subsidiary. The Union did not. Under these circumstances, the parent should be estopped from asserting that it was not a party to the 1974 agreement.
 
 SCOPE OF THE ARBITRATION CLAUSES
 
 56
 Even though Ratner Corporation is bound by the collective bargaining agreements with the Union, it need not arbitrate the dispute over subcontracting unless that dispute is within the scope of the arbitration clause. Cf. Gateway Coal Co. v. United Mine Workers of America, 414 U.S. 368, 374, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962).
 
 
 57
 Although this is usually a question for the courts, the parties may agree to make arbitrable even disputes regarding which issues must be submitted to arbitration. See Leyva v. Certified Grocers of California, Ltd., 593 F.2d 857, 861 (9th Cir. 1979). The parties to the 1971 agreement so contracted. Consequently, the question whether Ratner Corporation must submit to arbitration over the alleged violations of the no-subcontracting clause during the term of the 1971 agreement must itself be arbitrated.
 
 
 58
 The 1974 arbitration clause omitted the language making disputes about the coverage of the arbitration clause arbitrable. We must examine that clause to determine whether it encompasses the subcontracting dispute. We do not resolve the merits, but examine the facts only to assess arbitrability.
 
 
 59
 The language of the 1974 clause is extremely broad.
 
 
 60
 All complaints, grievances or disputes arising between the parties hereto relating directly or indirectly to the provisions of this Agreement shall in the first instance be taken up for adjustment by a representative of the Union and a representative of the Employer. In the event they are unable to adjust same then such matter shall be submitted to an arbitrator . . . .
 
 
 61
 (Emphasis added.)
 
 
 62
 Article 19 of the agreement governs the contracting of garment manufacturing to other factories. It stated that the Employer may only subcontract with factories which have contracts with the Union. During the term of the 1974 agreement, several Ratner subsidiaries contracted to have non-union factories manufacture garments.
 
 
 63
 In order to effectuate the strong policy favoring arbitration of labor disputes, See, e.g., United Steelworkers of America v. American Mfg.,363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), doubts regarding the scope of an arbitration clause "should be resolved in favor of coverage." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Here there is no doubt to resolve. Whether Ratner Corporation violated Article 19 by subcontracting with non-union factories through its subsidiaries is clearly within the broad scope of the arbitration clause. The court below erred in refusing to compel arbitration.
 
 UNFAIR LABOR PRACTICES
 
 64
 Ratner Corporation makes the final argument that, by compelling it to arbitrate the subcontracting dispute, we would force its subsidiaries now without contracts with the Union to recognize it as their bargaining agent. This, it contends, would constitute an unfair labor practice because the employees of the subsidiaries have a right to select their own representatives. Cf. International Ladies' Garment Workers Union v. NLRB, 366 U.S. 731, 737, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).
 
 
 65
 The company refers us to General Warehousemen & Helpers Local 767 v. Standard Brands, 579 F.2d 1282 (5th Cir. 1978), in which the court denied enforcement of an arbitration award which would have required the employer to violate the terms of its agreement with another Union. The argument lacks merit.
 
 
 66
 The Union does not seek to represent the employees of the Ratner subsidiaries. It seeks only to compel Ratner Corporation to arbitrate under a collective bargaining agreement covering those initially employed by Ratner Manufacturing, as to a clause negotiated for their benefit.
 
 
 67
 Even if the arbitrator were to find that Ratner Corporation had violated the no-subcontracting provision, this collective bargaining agreement says nothing about requiring the Ratner subsidiaries to accept the Union as their bargaining agent.
 
 
 68
 It is unlikely that the result of the arbitration will be to force Ratner Corporation to commit an unfair labor practice. If the company still believes that result will follow after the arbitrator's decision is announced, then it may challenge enforcement of the award as did the employer in General Warehousemen & Helpers Local 767. The prospect is now too speculative to provide grounds to refuse to compel arbitration.
 
 
 69
 Reversed and remanded for proceedings in accordance with this opinion.
 
 
 
 *
 Of the District of Oregon
 
 
 A
 All complaints, grievances or disputes arising between the parties hereto relating directly or indirectly to the provisions of this Agreement shall in the first instance be taken up for adjustment by a representative of the Union and a representative of the Employer. In the event they are unable to adjust same then such matter shall be submitted to an arbitrator mutually agreed upon by the parties. In the event the parties are unable to agree upon an Arbitrator within five (5) working days from the request by either party for arbitration, the parties shall request the Federal Mediation and Conciliation Service to submit a list of seven (7) Arbitrators. The parties hereto shall, within a maximum of seven (7) working days, first the Employer and then the Union, alternatively strike from this list a name until there is one left. That person shall be the Arbitrator. The decision of the arbitrator shall be final and binding
 
 
 B
 Except as otherwise expressly provided in this Agreement, decisions of the Arbitrator shall be effective as of the date the decision is rendered. Failure to abide by such a decision shall be considered as a breach of this agreement and the other party, anything contained in this Agreement to the contrary notwithstanding, shall be free to enforce such decision by such action as it deems appropriate
 
 
 C
 Except as expressly provided otherwise in this Agreement, with respect to any dispute subject to arbitration or any claim, demand, or act arising under the Agreement which is subject to arbitration, the procedure established in this Agreement for the adjustment thereof shall be the exclusive means for its determination. No proceeding or action in a court of law or equity or administrative tribunal shall be initiated with respect thereto other than to compel arbitration or to enforce, modify or vacate an award. This paragraph shall constitute a complete defense to or ground for a stay of an action instituted contrary hereto
 
 
 D
 Compensation and expense of the Arbitrator shall be shared and paid equally by the Employer and the Union