W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,

v.

TYSON'S POULTRY, INC., a corporation, and John Tyson, Appellees.

No. 18101.

United States Court of Appeals Eighth Circuit.

Jan. 20, 1966.

Carin A. Clauss, Atty., U. S. Dept. of Labor, Washington, D. C., Charles Donahue, Solicitor of Labor, Bessie Margolin, Associate Solicitor, and Robert E. Nagle, Atty., Dept. of Labor, Washington, D. C., and Beverley R. Worrell, Regional Atty., U. S. Dept. of Labor, Birmingham, Ala., for appellant.

Courtney C. Crouch, of Crouch, Blair & Cypert, Springdale, Ark., for appellees.

Before VOGEL, Chief Judge, and BLACKMUN and GIBSON, Circuit Judges.

VOGEL, Chief Judge.

The sole question presented on this appeal is whether the employees of defendant-appellee Tyson's Poultry, Inc., came within the agricultural exemption of the Fair Labor Standards Act, 29 U.S. C.A. § 201 et seq. (hereafter Act) during the period in question, April 12, 1962, to June 1, 1963. Such exemption would permit appellees to avoid complying with minimum wage and overtime compensation provisions of the Act. The District Court held the exemption applicable. We affirm.

Appellee Tyson's Poultry, Inc., is an Arkansas corporation engaged in the processing and marketing of eggs. During the period in question it operated an egg assembly plant at Springdale, Arkansas. The employees at appellee's establishment worked at "assembling, grading, handling, sizing, candling, packing and shipping eggs". Appellee Tyson's Poultry, Inc., did not own or lease any farms but obtained its eggs from Poultry Growers, Inc., a corporation which, like Tyson's Poultry, Inc., is a wholly-owned

subsidiary of Tyson's Foods, Inc. The individual defendant-appellee, John Tyson, is president of Tyson's Foods, Inc., as well as of the two subsidiary corporations.

By stipulation, it was established that of all the eggs produced at the Springdale plant during the representative month of April 1963 " * * * twenty-seven percent (27%) of such total production was procured from [three independent] growers under and pursuant to the Tyson Commercial Layer Contract."[1] Under this contract[2] Tyson furnished

1. On this appeal the Secretary of Labor challenges only the eggs produced for appellees by the independent growers. He alleges that the source of the 27% of appellees' egg production is enough to defeat the agricultural exemption on any and all eggs produced by appellees. He reasons as follows:

    " * * * Moreover, the performance of work on eggs procured from the contract growers is alone sufficient to defeat the exemption, under the well-settled rule that the performance of both exempt and nonexempt activities by an employee in the same workweek results in loss of the exemption. See, e. g., Mitchell v. Hunt, 263 F.2d 913 (C.A. 5); Tobin v. Blue Channel Corporation, 198 F.2d 245, 248 (C.A. 4); Wabash Radio Corporation v. Walling, 162 F.2d 391, 394 (C.A. 6); Anderson v. Manhattan Lighterage Corp., 148 F.2d 971 (C.A. 2), certiorari denied 326 U.S. 722, 66 S.Ct. 27, 90 L.Ed. 428."

    The remaining sources of eggs produced by appellees were five premises leased by Poultry Growers, Inc., (accounting for 71% of production) and a farm owned by Poultry Growers, Inc. (accounting for 2% of production). The Secretary challenged the 73% as also defeating the exemption in the court below but has appealed only as to the 27% of the eggs produced by the independent contractors. Therefore, no consideration will herein be given to the 73% production figure.

2. A Tyson Commercial Layer Contract, designated as Exhibit B, was entered into between the independent grower and Poultry Growers, Inc. Poultry Growers, Inc., turned its eggs obtained under such contract over to appellee Tyson's Poultry, Inc. A copy of the Commercial Layer Contract follows:

    "Tyson Commercial Layer Contract.

    "Effective January 15, 1962, Tyson Commercial hen contract payment to the grower will be as follows:

    "When birds are housed, payment will begin on the basis of ½ cent per hen, per week until 10% production is reached.

    "When 10% production is reached, grower will be set up on the following pay scale:

    Eggs that grade U.S.D.A.A. Quality ...................... 5¢ per dozen
    Eggs that grade Ark. Grade A Quality ....................3.5¢ per dozen
    Eggs that are Stained, Cracked or Checked ................ 2¢ per dozen
    Shortage or Broken due to Farm ......................... 0¢ per dozen

    "Pay periods will run from 1st to 15th and 15th to 30th. Each grower will receive a check and grading report twice per month.

    "Tyson Company will furnish all birds (placed on 2 sq. ft. per hen) feed, litter, medication, nest pads, and scheduled egg pickup program.

    "Contract grower will furnish house, labor, utilities, and equipment.

    "I ....................... have read and understood the terms of this contract and agree to it. I understand that I am an independent grower and not an employee of Tysons.

    Date ...............................
    Signed ...............................
    Address ...............................
    Phone No. ...............................

    ...............................
    Poultry Growers, Inc.
    RB/bb"

the contract growers all of the birds and supplies needed to maintain them. Further, Tyson supervised a scheduled egg pick-up program. The growers provided the premises, labor and certain equipment for the preservation of the birds. The District Court, through the Honorable John E. Miller, District Judge, specifically found the following:

" * * * Under that contract [the Tyson Commercial Layer Contract set out at f.n. 2, supra], Poultry Growers, Inc., was required to furnish the hens, food, litter, medication and nest pads and to take the eggs that had been gathered from the nests by the owner of the farm. Title to the hens and all eggs produced was at all times vested in Poultry Growers, Inc. The contract grower furnished the house, utilities, and performed the day-to-day labor such as feeding and watering the flocks, cleaning the pens, and gathering the eggs."

He thereafter directs attention to the schedule of payments which Poultry Growers, Inc., was required to make for the use of the chicken houses, etc., and to the fact that the furnisher of the facility was to receive nothing for broken eggs. He found that under the contract the appellees controlled and made all important decisions regarding the production of eggs. It is obvious that the contract grower assumed no risk but merely furnished the house, labor, utilities and equipment and was paid therefor at a scale completely unaffected by the market. If the market on eggs went up, the appellees gained. If it went down, the loss was that of appellees. If the birds became ill or died or quit producing for one reason or another, the loss was that of appellees and not the contract grower. If the cost of feed or medication went up or down, the loss or gain was that of the appellees. The three contract growers merely followed instructions and gathered the eggs, being careful not to break them as they were not paid on the basis of broken eggs.

The Act at 29 U.S.C.A. § 213, Exemptions, provides in pertinent part:

"(a) The provisions of sections 206 [dealing with minimum wages] and 207 [dealing with maximum hours] of this title shall not apply with respect to—

\*    \*    \*    \*    \*    \*

"(6) any employee employed in agriculture * * *."

29 U.S.C.A. § 203 provides:

"(f) 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodites (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

Title 29 CFR, Labor, § 780.166 provides, as to particular operations or commodities:

"Subject to the rules heretofore discussed, the following activities are, among others, activities that may be performed in the 'preparation for market' of the indicated commodities and may come within the exemption:

\*    \*    \*    \*    \*    \*

"(d) *Eggs.* Handling, cooling, grading, candling, and packing."

The answer to the question of whether or not the work performed by the appellees' employees brings them within the purview of the agricultural exemption is, of course, not simple. The difficulties are pointed out by Mr. Justice

258

Frankfurter in a separately concurring opinion in Farmers Reservoir & Irrigation Co. v. McComb, 1949, 337 U.S. 755, 770, 69 S.Ct. 1274, 1282, 93 L.Ed. 1672, rehearing denied, 338 U.S. 839, 70 S.Ct. 31, 32, 94 L.Ed. 513:

"Both in the employments which the Fair Labor Standards Act covers and in the exemptions it makes, the Congress has cast upon the courts the duty of making distinctions that often are bound to be so nice as to appear arbitrary in relation to each other. A specific situation, like that presented in this case, presents a problem for construction which may with nearly equal reason be resolved one way rather than another."

Unfortunately Congress was not able to anticipate every activity that might conceivably arise under the Act, such as that activity involved herein. As noted by Mr. Justice Clark in Maneja v. Waialua Agricultural Co., Ltd., 1955, 349 U.S. 254, 265–266, 75 S.Ct. 719, 726, 99 L.Ed. 1040:

"But in making the factual determination [as to if a particular operation fell within the agricultural exemption], we must keep in mind that the question here presented is a limited one: is the * * * operation [involved] part of the agricultural venture? If it is agriculture, albeit industrialized and involving highly specialized mechanical tasks, we must hold it to be within the agriculture exemption. Thus we must add to the factors above some consideration of what is ordinarily done by farmers with regard to this type of operation. It is true that the word 'ordinarily' appeared in an earlier version of the exemption and was subsequently stricken, but the inquiry is nonetheless a pertinent one. It has a very direct bearing in determining whether the milling operation is really incident to farming."

Egg processing would seem to be an activity ordinarily done by the farmer and would thus qualify appellees for the agricultural exemption if appellees truly are the farmers herein.

■■ Under the facts herein, we find no problem concerning the relationships among Tyson's Foods, Inc., its two subsidiary corporations, appellee Tyson's Poultry, Inc., and Poultry Growers, Inc., and appellee John Tyson, who is president of all three corporations. As stated by Judge Waterman in Wirtz v. Jackson & Perkins Co., 2 Cir., 1963, 312 F.2d 48, 50, there is

" * * * nothing in the language or history of the Fair Labor Standards Act to suggest that Congress intended the availability of the agricultural exemption to turn upon the technicalities of corporate organization within which farming operations or practices performed incidental thereto were conducted."

We are here concerned with a single and completely integrated farming operation carried on and headed up by appellees through their affiliated corporation, Poultry Growers, Inc. As found by the District Court, the appellees are farmers and are the ones who initiated the farming operations here involved. Without appellees the independent growers arguably would never have undertaken the initial and continuing cost of acquiring the birds and producing the eggs. The contract growers merely aid the appellees, who the District Court found to be the ones qualified to claim the agricultural exemption under the Act as to their employees engaged in the "handling, cooling, grading, candling and packing" of eggs.

This court, in Walling v. Rocklin, 8 Cir., 1942, 132 F.2d 3, was confronted with a somewhat similar situation also involving an ultimate fact determination under the Fair Labor Standards Act as to whether employees of a retail and wholesale floral shop qualified for the agricultural exemption where the flowers were originally raised by other employees of the defendant therein. In upholding the exemption, we stated, through the

late Judge Gardner, at page 6 of 132 F.2d:

"Defendants contend and the trial court was of the view that they are engaged in the production of horticultural commodities as a single integrated unit, and that they are farmers within the meaning of the statute. The court found as an ultimate fact that the defendants including their employees at Pierce Street were exclusively engaged in agriculture. This finding should not be disturbed unless clearly erroneous. Rule 52(a), Federal Rules Civil Procedure, 28 U.S.C.A. following section 723c. The Pierce Street shop or store is maintained by defendants as a part of their business of producing and disposing of their floral products. It is not maintained as a separate enterprise but only in connection with and incidental to the general enterprise in which the defendants are engaged. The exemption includes any practices performed by a farmer as an incident to or in conjunction with his farming operations including preparation for market, delivery to storage, or to market, or to carriers for transportation to market.

\*    \*    \*    \*    \*    \*

"\*  \*  \* The nature of the work done at this shop should not, we think, be considered as segregated from the entire enterprise. Everything that is there done is 'an incident to' or 'in conjunction with' the agricultural enterprise which is being carried on by defendants."

We cannot say that the egg handling and processing here should be "segregated from the entire enterprise" and we must accept the District Court's ultimate fact conclusion of an integrated farming unit as being supported by the record and not clearly erroneous. It follows that the classification of appellees' employees as coming within the meaning of the agricultural exemption is correct and may not be disturbed on appeal.

The Secretary relies upon a number of cases which we, as did the District Court, find factually distinguishable. For example, the Secretary finds Mitchell v. Huntsville Wholesale Nurseries, Inc., 5 Cir., 1959, 267 F.2d 286, of primary persuasion. Therein, the Fifth Circuit held that an employer who *purchased* rose bushes in Texas and warehoused them in Huntsville, Alabama, some 500 miles away, did not come within the meaning of the agricultural exemption in the Fair Labor Standards Act, even though the employer involved did "contribute counsel and advice" (p. 291), made advances and in other ways assisted the growers. Therein the court stated at page 291:

"\*  \*  \* We think that, judged by every aspect and understanding of farming, it must be held that the Texas growers are the farmers as to the rose bushes grown there, and that Huntsville is not. The growers are not employees or agents of Huntsville. Mitchell v. Hertzke, 10 Cir., 234 F.2d 183. It is true enough that Fraser [one of the parties seeking the agricultural exemption therein] does contribute counsel and advice, does in some instances make advances, does furnish a farm market, and does in other ways, as the purchaser of the bushes, assist the growers. But these things are not farming in the sense of the statutory exemption."

Distinguishing characteristics between *Huntsville* and the instant case are, among others, (1) that in the former case if the producing stock (rosebushes) died, the loss was that of the growers. Here the appellees furnished and owned the producing stock (birds). If the producing stock died, the loss was the appellees'. (2) In *Huntsville*, the court determined that the growers were not agents or employees. There were indications that they sold to other wholesale nurseries. For example, "\*  \*  \* Lakeview grows more rosebushes for another wholesale nursery company than it grows for Huntsville." (F.n. 2 at p.

289 of 267 F.2d). In the instant case the contract growers are clearly agents of the appellees through whom the appellees operated their egg producing business, even though the growers may have also been "independent growers" for some purposes. (3) Contrary to the situation in Huntsville, the appellees herein supplied the feed and medication to the producing stock. (4) In Huntsville the warehouse was located approximately 500 miles away from the producer's rosebushes. Here there was no geographic distance factor involved. (5) In Huntsville the nursery was described as being the purchaser (p. 289 of 267 F.2d). There the goods were sold " * * * to Huntsville on invoices which described them as 'sold to' appellee and * * * these invoices are filed in a voucher file marked 'merchandise purchased' together with other invoices concededly relating to purchases." (267 F.2d at f.n. 2, p. 289). In the instant case the appellees were in no sense of the word purchasers of the eggs obtained pursuant to the Commercial Layer Contracts since they owned the eggs from the beginning as well as the hens that produced them. This was true even though the growers herein were paid on a per egg basis, once 10% production was reached. (6) In Huntsville the soil which produced the rosebushes was not owned by the employer, whereas herein the appellees owned the birds which produced the eggs. As stated by the court in Huntsville at pages 290–291 of 267 F.2d:

> " * * * · It is a question of considering the undisputed facts as they are proven and established and determining whether what is claimed by Huntsville to be its own farming is in reality the farming of others."

The "farming" herein is that of appellees since, but for their investment and other help, the independent growers would arguably never have raised the egg-producing birds themselves. The holding in Huntsville persuades rather than dissuades us of the correctness of the holding by the District Court herein.

Another case relied on by the Secretary is Wirtz v. Jackson & Perkins Co., supra. Therein the defendant was the operator of a very substantial nursery business. That trial court held and the Second Circuit affirmed that the agricultural exemption would apply to work done on rosebushes and other nursery stock at a storage house in New York on stock received from the defendant's adjoining Newark farms, its farms in Arizona, farms of wholly-owned subsidiaries in Indiana, California and New Jersey, and farms of wholly independent producers. However, the trial court also held therein that services with respect to stock handled in the defendant's storage warehouses purchased from independent growers under continuing supply contracts did not come within the exemption. The defendant entered a cross-appeal covering this portion of its business and the Court of Appeals affirmed the trial court. In doing so it stated at page 51 of 312 F.2d:

> " * * * It is not significant that Jackson & Perkins provided understock to these contract growers which was planted and cultivated by them. *The growers provided the land, labor and equipment, and agreed to indemnify defendant for any claims arising out of the farming operations. The growers bore any losses due to crop failures, save for the cost of the original understock,* and the developed stock was sold by them to the defendant at a price calculated per saleable plant.
>
> "As to the stock purchased from these contract growers, therefore, Jackson & Perkins acted as a jobber rather than as a farmer, and hence services performed in handling such stock in the Newark storages were not services within the agriculture exemption of § 13(a) (6). Mitchell v. Huntsville Wholesale Nurseries, Inc., 267 F.2d 286 (5 Cir., 1959)." (Emphasis supplied.)

Although there are similarities between Jackson & Perkins Co. and the instant

case, there are also significant differences between the contract growers in the two situations. In the former case, such growers "sold" the stock to the nursery, presumably at market prices. The growers bore *all* losses due to crop failures and paid for *all* material used in raising the trees. The nursery acted as a jobber rather than as a farmer as it took no active participation in growing the trees once it had provided the stock. We do not find *Jackson & Perkins Co.* conclusively persuasive as to the Secretary's contentions herein.

The Secretary cites Chapman v. Durkin, 5 Cir., 1954, 214 F.2d 360, certiorari denied, 348 U.S. 897, 75 S.Ct. 218, 99 L.Ed. 704, for the proposition that having title to the crop does not make a "farmer" of one who does not operate the farm. Therein the court was dealing with "bird dog" operators who took title to fruit on the trees, allowed it to ripen, and then harvested it with their own employees. Such case is no authority for the Secretary's proposition herein. In *Chapman* and in Fort Mason Fruit Co. v. Durkin, 5 Cir., 1954, 214 F.2d 363, certiorari denied, 348 U.S. 897, 75 S.Ct. 218, 99 L.Ed. 705, a companion case to *Chapman*, the employers did not own the trees. In fact, they had absolutely nothing to do with them except to take title to unripened fruit. In the instant case the employer-appellees owned both birds and eggs and furnished feed and medication to sustain the birds.

The Secretary cites a case from this court, Goldberg v. Crowley Ridge Fruit & Vegetable Growers Ass'n, 8 Cir., 1961, 295 F.2d 7. Therein it was found that the employer, a cooperative fruit packers association, owned no farms and was not engaged in farming. The employer's entire activity consisted of operating a peach packing shed, not located on a farm, from which it packed and distributed peaches. The case was decided on the basis that it was "so apposite and directly in point in all material respects" (p. 10 of 295 F.2d) with Farmers Reservoir & Irrigation Co. v. McComb, supra, that that opinion was dispositive. We consider Goldberg v. Crowley distinguishable and not controlling herein. In *Farmers Reservoir & Irrigation Co.,* which controlled *Crowley*, the Supreme Court, speaking through Chief Justice Vinson, stated at pages 760–761 of 337 U.S., at pages 1277–1278 of 69 S.Ct.:

"Agriculture, as an occupation, includes more than the elemental process of planting, growing and harvesting crops. There are a host of incidental activities which are necessary to that process. Whether a particular type of activity is agricultural depends, in large measure, upon the way in which that activity is organized in a particular society. The determination cannot be made in the abstract. * * * The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity."

In the instant case the appellees carried on their egg-producing business as part of a self-sustained and operated entire "agricultural function". The egg-processing business was completely integrated with appellees' activities in providing birds and necessary supplies in marketing eggs. See Wirtz v. Jackson & Perkins Co., supra. We do not consider *Farmers Reservoir & Irrigation Co.* as controlling herein. We have examined all of the cases cited by the Secretary and find them lacking in persuasive support for his contention.

In view of our determination, we find it unnecessary to consider the Secretary's request for an injunction.

Affirmed.