Alberto **TERONES**, Jim Aguayo, Junior Bunch, Jose Jasso and Allan Slattengren, on behalf of themselves and all persons similarly situated, Plaintiffs,

v.

**PACIFIC STATES STEEL CORPORATION, Defendant.**

**No. C–79–2172–MHP.**

United States District Court, N. D. California.

April 20, 1981.

H. Tim Hoffman, Hoffman & Associates, Oakland, Cal., Daniel P. McIntyre, U. S. Workers of America, Pittsburgh, Pa., for plaintiffs.

James A. Carter, Specter, Stevens & Carter, San Francisco, Cal., for defendant.

## MEMORANDUM DECISION

PATEL, District Judge.

Plaintiffs and the class they represent were long time employees of defendant Pacific States Steel and were participants in a pension plan maintained by defendant. The Plan was negotiated on behalf of plaintiffs by their exclusive bargaining representative, United Steelworkers of America, AFL–CIO–CLC. It was established in the early 1950s as a cents-per-hour plan. Later it was changed to a defined-benefit plan.

On October 30, 1978, defendant permanently shut down its only plant and either refused to pay pension benefits or paid them at reduced rates. The defendant contends it was authorized to terminate the Plan. It premises this contention on the terms of the agreement, the bargaining history surrounding the Plan and the conduct of the parties in relation to it. Defendant further argues that because of this history and conduct plaintiffs are estopped from claiming the Plan could not be terminated by the company when it shut down its plant.

## PROCEDURAL HISTORY

This action was initiated under the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, seeking preliminary and injunctive relief requiring defendant to pay pension benefits in accordance with the provisions of ERISA and the terms of the Plan itself. Without waiving the denial of the jurisdiction of the arbitrator to rule on these issues, plaintiffs agreed with defendant to submit the claims to arbitration. The arbitrator ruled that the claims were not arbitrable and the matter is now before this Court on the issue of whether the defendant was authorized to terminate the Pension Plan upon shutdown.

On March 5, 1980, the Court issued a preliminary injunction ordering in part "[t]hat the Company shall, as expeditiously as possible and beginning with the March benefits, pay benefits from the plan in accordance with the plan's stated provisions and without any reduction which may be permitted upon termination of the plan."

At trial the matter was submitted by the plaintiff upon deposition testimony and exhibits. The defendant, in addition to similar designations, produced the testimony of the former president of defendant company, Joseph Eastwood, and the company's director of labor relations at the pertinent times in question, Kenneth Steadman. Plaintiffs moved for judgment in their favor at the end of defendant's case in chief and before presenting any rebuttal evidence.

This Court need only determine whether the termination was permissible. Then, under the provisions of ERISA, the Pension Benefit Guarantee Corporation (PBGC) will decide upon eligibility, benefit levels, funding and related issues.

## FINDINGS OF FACT

The Pension Plan in question contains no specific provision as to who may terminate the Plan or under what conditions it may be terminated. The Plan in effect at the time of the shutdown was effective as of December 1, 1977 and had an expiration date of November 30, 1980. The only terms of the Plan referring to termination are set forth in section 17. That section provides for the allocation, funding and distribution "in the event of termination of the Plan." It speaks only in terms of "in the event of termination"; it does not address the means by which the fund may be terminated.

Defendant, through its president and director of labor relations, relies upon sections 16 and 17 of the Plan and upon section 4 of the Basic Agreement for their authority to terminate the plan.[1] The defendant fur-

---

1. Section 16 contains general provisions with respect to the fund and the manner in which contributions shall be made to the fund. It makes no specific provision with regard to who may terminate the fund. Section 4 of the Basic Agreement provides as follows:

04.00.00 MANAGEMENT
04.01.00 The Company retains exclusive rights to manage the business and plant and to direct the working forces. The Company in the exercise of its rights, shall observe the provisions of this Agreement.

ther relies upon the lengthy bargaining history to support this conclusion. That history began in the early 1950s. Both Messrs. Eastwood and Steadman were involved in the various negotiations regarding the plan including the time when it was changed from a cents-per-hour plan to a defined-benefit plan.

During these negotiations, pension experts or specialists for the union and the company were generally involved. For example, in the 1971 negotiations, improvements in the Plan were agreed to and both parties relied upon the experts for their advice. At no time was unilateral termination of the Plan by the company whether by plant shutdown or other means actually negotiated.

Termination of the Plan was first discussed during the 1977 negotiations which led to the Agreement and Plan in effect at the time of the permanent shutdown in 1978. The context in which it was discussed was the financial condition of defendant company and the strong likelihood of closing down the plant. Representations made on behalf of the company were that if there was a strike the company would be forced to close down the plant, lay off employees and reduce or terminate pension benefits. These consequences were the subject of discussions with the union negotiating team and were communicated to the membership by leaflets and other informational material. Union members were advised of the actual consequences by distributed precomputed benefit schedules. At no time during negotiations did any union representative specifically state that benefits could not be reduced or affected in this manner. The general practice of company and union was to lay out all the facts known to it so as not to "sandbag" the other.

At no time during the 1977 negotiations were any pension experts called in or consulted by either side. Steadman's understanding while director of labor relations for the company and in his prior role as union member was that the company could unilaterally terminate the Plan.

The actual right to terminate and terms and conditions of termination were never the subject of any negotiations. Neither the Plan itself, the Basic Agreement nor the summary booklet of the Plan, required by 29 U.S.C. § 1022 and distributed to the members, contains any provision regarding the company's right to terminate the Plan. The retirement plan for salaried employees of Pacific States Steel expressly gives the company the right to amend or terminate the agreement. It specifically provides for the events which will give rise to an automatic termination of the Plan.

To the extent that findings of fact appear in other portions of this opinion they shall be deemed the findings of fact of this Court as if fully set forth in these findings pursuant to Fed.R.Civ.P. 52(a).

CONCLUSIONS OF LAW

■ This Court has jurisdiction over this action by reason of the provisions of ERISA, 29 U.S.C. § 1132(e)(1) and (e)(2). The Pension Plan which is the subject of this action is a defined-benefit plan covered by ERISA. Section 1102 of the Act requires that "every employee benefit plan shall be established and maintained pursuant to a written instrument." While the Act itself does not specifically provide that the manner of or authority for termination must be spelled out in the agreement, its general thrust strongly suggests that any terms which may adversely affect benefits are to be spelled out. One of the concerns expressed by Congress was the frequent termination of plans that resulted in deprivation or reduction of benefits.

The purpose of the Act was to regulate covered plans, assure their soundness and provide safeguards for and disclosures to employees (section 1001). Thus it is required that employees be given written

04.02.00 The right to manage the business and plant and to direct the working forces includes the right to hire, suspend or discharge for proper cause, or transfer, and the

right to relieve employees from duty because of lack of work or for other legitimate reasons.

plan descriptions and summary plan descriptions which include among numerous other details the date of the end of the plan year (section 1022(b)). Each plan must specify a procedure for amendment and for persons having authority to amend it. As a part of the elaborate regulatory scheme, a Pension Benefit Guarantee Corporation was established within the Department of Labor to administer guarantee funds and plan terminations.

In short, although ERISA does not speak directly to the issue here its general purpose is to prevent the loss or diminution of pension benefits by plan termination. Congress noted in explaining the reasons for the Act that there were 1227 plan terminations in 1972 resulting in the loss of 49 million dollars in benefits. H.R.Rep. No. 93–807, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News, 4639, 4680. The Senate expressed its concern over this hardship at length. S.Rep. No. 93–383, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 4890, 4898–912. It has been generally recognized, both pre- and post-ERISA, that public policy favors construing pension plans in favor of the employee and to avoid forfeiture of benefits. *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945, 956 (D.Mass.1979); *Frietzsche v. First Western Bank & Trust Co.*, 168 Cal.App.2d 705, 707, 336 P.2d 589, 590 (1959). Keeping these policy considerations in mind, it is necessary to turn to the Plan itself.

By its terms the pension agreement in effect at the time of plant shutdown had an expiration date of November 30, 1980. Specifically, section 19.1 provided that the Plan shall remain in effect until the expiration date "subject to the reopening and collective bargaining provisions of Section 20.00.-00 of the Basic Agreement . . . ." One of the subsections of that provision, 20.02.00 states that the Basic Agreement "may be terminated by either party, by giving at least 90 days written notice by certified mail to the other party prior to the final termination date . . . ." The final termination date in this case was November 30,

1980. Subsection 20.02.01 provides for meet and confer terms in the event of such notice. In addition, section 17.00.00 of the Basic Agreement provides that the terms of the pension program come under the general provisions of the Agreement.

While the Pension Plan sets forth the responsibilities of the parties in the event of termination, it makes no provision for the manner in which the Plan may be terminated or who has the authority to terminate. The defendant contends that the existence of these provisions (section 17) implies a right to terminate and that the right is a unilateral one of the company. This interpretation is contrary to the provisions of the Plan and the Basic Agreement when the two are read together. In addition, they conflict with public policy as well as the history of the collective bargaining of these particular pension benefits.

Plaintiff correctly argues that collectively bargained plans are presumed to continue for the life of the bargaining agreement. In addition, the conditions under which a plan may be terminated are as much the subject of bargaining as are the terms of eligibility, contributions or benefit amounts.

Defendant company has suggested that the inclusion in the Plan of provisions for termination of the Plan is indicia of its right to terminate upon shutdown. Indeed, both Messrs. Eastwood and Steadman stated they were relying upon sections 16 and 17 for their assertion of this right.

This conclusion is not supported by a plain reading of this section together with other provisions of the Plan and the Agreement. None of the terms or conditions reserve any right of termination to the employer and, absent language suggesting otherwise, none will be read into an agreement which purports to be the negotiated pension agreement of the parties. The Court cannot write into the agreement terms which are omitted. Nor is there any ambiguity in the terms that lends itself to an interpretation that authority to discontinue was given to any party. By omission of such provision

the unilateral authority to terminate is given to neither party. The omission by its absence is as clear as any specific inclusion.

In its argument the defendant appears to retreat from the position that it can unilaterally terminate the Plan and urges that the union by its silence either acquiesced in the termination or is estopped from its claim.

The defendant maintains that the bargaining history shows that union representatives knew that the company took the position that it could unilaterally terminate the Plan on shutdown and that either the union agreed with that interpretation or chose to remain silent in the face of it.[2]

The first time this issue arose in any negotiations was in 1977. Pacific States Steel was facing serious financial problems and during the negotiating period informed the union representatives and membership that in case of further labor unrest or difficulties the company would close down the plant and terminate the pension plan. The issue of whether the company could terminate or the manner of termination was not actually negotiated. No contract provisions were ever drawn up. No union representative ever responded that the company could not terminate. This, says defendant, constitutes the union's acquiescence in Pacific's assertion.

■ Defendant does not elaborate as to whether this acquiescence constituted an acceptance of the termination terms proffered by it or a waiver of a right previously conferred under the Plan. It does not matter. For in either case the consent or waiver must be clear and unequivocal and must have been with full knowledge of the facts and an intent to assent or waive.

■ The National Labor Relations Board has held that silence as to retirement and pensions in the collective bargaining agreement does not constitute relinquishment of those rights. *TTP Corp.,* 77 L.R.R.M. 1097

(1971). In that case the contract had no express provision giving the employer the unilateral right to terminate. The board held that actions which result in changes in the terms and conditions of a pension agreement are subject to bargaining just as any other terms or conditions of employment. The board further noted that the union's relinquishment of the right to bargain on such issue must be clear and unmistakable. *See also Wayne's Olive Knoll Farms, Inc.,* 223 N.L.R.B. 260 (1976).

Even where the employer has specifically reserved the right to change or discontinue a plan, courts have refused to permit termination where vested rights would be cut off or diminished. *Hoefel v. Atlas Tack Corp.,* 581 F.2d 1 (1st Cir. 1978). *But cf. Boase v. Lee Rubber & Tire Corp.,* 437 F.2d 527 (3d Cir. 1970) (agreement contains specific unambiguous provisions of the right of the company to change, suspend, discontinue or terminate the plan.)

Acquiescence will not be presumed from the conduct of the union in this case. Its mere silence does not suggest an acceptance of unwritten terms when those terms would result in substantial detriment to rights negotiated and earned in the past. The union accepted a pension agreement substantially the same as it had agreed to in past negotiations. The company made no effort to include specific provisions for termination. The mere fact that it asserted it had such rights by threatening to terminate them did not subject them to bargaining or have the consequence of foisting them upon the union. The fact that neither party had its pension experts present during the negotiations, as was the case in past sessions when pension terms were involved, further suggests that neither side considered pension conditions to be the subject of negotiation.

There being neither acceptance of the position put forth by Pacific nor waiver of any rights by the union, the question then is whether the union is estopped by its silence.

**2.** Pursuant to an earlier ruling of this Court, evidence of bargaining history was admitted (Order Denying Exclusion of Parol Evidence, Oct. 27, 1980). *See United Steel Workers of*

*America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Syufy Enterprises v. Northern Cal. State Ass'n of IATSE Locals,* 631 F.2d 124 (9th Cir. 1980).

The doctrine of estoppel is accepted in labor relations and in pension benefits cases. *Amalgamated Clothing and Textile Workers Union v. Ratner Corp.*, 602 F.2d 1363 (9th Cir. 1979); and *Lix v. Edwards*, 82 Cal.App.3d 573, 147 Cal.Rptr. 294 (1978). It requires a showing that the party to be estopped knows the facts; that it intends its conduct to be relied upon; that the party asserting estoppel is ignorant of the facts; and that it has relied upon the conduct to its injury.

What are the facts of which the union had knowledge and of which Pacific was ignorant? Pacific claims it was unaware of the belief by the union that the company could not terminate the Plan. In other words, Pacific urges that the union representatives knew or believed that Pacific could not terminate the Plan, yet despite Pacific's protestations to the contrary, they remained silent and, induced by that silence, Pacific entered into an agreement believing the union concurred with its position.

Neither the facts nor careful application of this equitable doctrine will support its successful assertion here. The need for clear unambiguous conduct is as great when relying on estoppel as when relying on waiver or acquiescence in the context of labor negotiations. There is no clear, unequivocal conduct or characterization that may be given to the silence of the union that will raise it to the level of a misrepresentation or concealment. It is well recognized that the silence or concealment must relate to a fact and not to a mere expression of opinion. What various union representatives may have believed about the authority of the company to terminate the pension plan may constitute fact. But the actual belief would amount to nothing more than the opinion of lay persons who are not experts or well versed in the intricacies of pension plans. Even construing whatever belief was held as fact in that it was a belief held by the union representatives, the estoppel theory fails.

There is no evidence from which it reasonably can be inferred that the representatives knew the company could not terminate the Plan. Mere silence cannot satisfy this requirement. The statements that Eastwood and Steadman have always understood the company to have this right cannot impute knowledge to the union.

The Court should be reluctant to allow an equitable principle to be used to cut off rights that legislation and public policy have carefully preserved. The principle should only be invoked when it can be clearly established and where its denial will result in injustice. Neither of those conditions are met.

For the foregoing reasons the Court finds that the defendant company could not terminate the Pension Plan when it shut down its plant in October 1978. It did not have the unilateral right to terminate. The union did not acquiesce in the termination nor is it estopped from asserting its position.

Plaintiff's motion for judgment in its favor is granted. Plaintiff's counsel shall submit an order in accordance with this decision.