The CAREAU GROUP, a California corporation, d.b.a. Egg City, Plaintiff,

v.

UNITED FARM WORKERS OF AMERICA, AFL–CIO, Defendant.

No. CV 86–5695 JMI (Kx).

United States District Court, C.D. California.

June 30, 1989.

Wayne Hersh and Geoffrey Gega, Finkle, Hersh & Stoll, Irvine, Cal., for The Careau Group.

Diana Lyons, Lyons, Macri–Ortiz, Schneider, Dunphy & Camacho, Keene, Cal., for United Farm Workers of America, AFL–CIO.

OPINION AND ORDER DISMISSING ACTION FOR LACK OF SUBJECT MATTER JURISDICTION

IDEMAN, District Judge.

Plaintiff is the Careau Group, a California corporation, doing business as Egg City

(hereinafter "Egg City"). Plaintiff is engaged in the business of raising chickens, and gathering, processing and selling eggs throughout Southern California. Plaintiff filed the instant action pursuant to § 303 of the National Labor Relations Act, (hereinafter "NLRA"), 29 U.S.C. § 187, to recover damages for defendant's alleged unfair labor practices in violation of NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4). Plaintiff argues that its egg processing plant is a commercial operation because it processes outside producers' eggs and egg products on a regular basis. Therefore, plaintiff argues that its processing plant workers are employees with the meaning of NLRA § 2(3), 29 U.S.C. § 152(3). Further, plaintiff alleges that the defendant represented these employees in union activities and therefore, the defendant is a labor organization within the meaning of the NLRA § 2(5), 29 U.S.C. § 152(5).

The defendant is the United Farm Workers of America, AFL–CIO (hereinafter "UFW"), an unincorporated association that represents workers in collective bargaining in California and elsewhere. The UFW was certified by the California Agricultural Labor Relations Board (hereinafter "ALRB") as the exclusive collective bargaining representative of Egg City's agricultural laborers pursuant to § 1156 of the Agricultural Labor Relations Act, (hereinafter "ALRA"), Cal.Lab.Code § 1140, et seq. Case No. 75–RC–21–M. Defendant argues that it is not a labor organization within the meaning of NLRA § 2(5), 29 U.S.C. § 152(5), and therefore this Court lacks subject matter jurisdiction over the instant action.

Defendant brought a motion for summary judgment on the jurisdictional issue. Plaintiff brought a cross-motion for partial summary judgment also addressing the issue of subject matter jurisdiction. On September 26, 1988, the Court heard oral argument by counsel on the motions. Having duly considered the parties' motion papers, the declarations, exhibits, and depositions submitted with the summary judgment motions, and the oral argument of counsel, the Court hereby GRANTS defendant's motion, and dismisses the instant action for lack of

subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## I. BARGAINING HISTORY

In April of 1979, Egg City and the UFW executed the first in a series of collective bargaining agreements. These agreements were renewed until the parties' January 29, 1984 through September 1, 1985, Agreement expired. The agreements contained a Recognition clause wherein the UFW was recognized "as the sole exclusive bargaining agent representing all of the Company's agricultural employees (hereinafter called "workers") in the unit set forth in Agricultural Labor Relations Board's certification in case number 75–RC–21–M." Art. 1, Subdiv. A. The agreements also contained a Successor clause which bound a sucessor owner to the terms of the agreement. Art. 42.

Plaintiff purchased the Egg City operation from its predecessor owner, the Kroger Company, on May 31, 1985. As part of the purchase agreement, plaintiff agreed to assume the terms of the Collective Bargaining Agreement between the UFW and Egg City then in effect and due to expire on or about September 1, 1985.

Shortly after the purchase of Egg City, the parties began negotiations toward a renewed agreement. On August 15, 1985, the UFW submitted its first written proposal, proposing, *inter alia*, no change in the Recognition clause. On August 26, 1985, Egg City submitted a counter-proposal and therein agreed to retain the Recognition clause. No renewed agreement was reached during the August negotiations, and the existing agreement expired by its own terms on September 1, 1985. Thereafter, the parties entered into a thirty day "Interim Agreement," dated September 19, 1985, reinstating some of the terms of the expired agreement until the parties reached a new agreement or a bargaining impasse. The parties conducted numerous negotiation meetings and exchanged numerous contract proposals through September of 1986, however, no new agreement was

reached. Throughout the negotiations, Egg City at no time proposed a change in the Recognition clause of the expired agreement.

During the period of negotiations, several events occurred which are relevant to the issue of this Court's jurisdiction. In August of 1985, a bargaining unit accretion issue arose when Egg City acquired the Fairview Ranch, another egg production operation. The UFW requested information, by letter dated August 20, 1985, regarding which of Fairview's workers were agricultural by virtue of their work exclusively with eggs produced by Egg City. Egg City responded by letter dated August 27, 1985, stating that the loading dock workers at Fairview Ranch were working exclusively on commodities produced by Egg City.

On or about May 8, 1986, Egg City filed an employer representational petition with the National Labor Relations Board, Region 31 (hereinafter "NLRB") requesting an election among workers in certain job classifications. Case No. 31–RM–1135. On or about May 28, 1986, the NLRB found in part that there was "no question concerning representation" and dismissed the petition.

On or about May 9, 1986, plaintiff filed a Chapter 11 reorganization petition with the United States Bankruptcy Court for the Central District of California. Case No. LA 86–8530–CA. The bankruptcy court issued an Order on June 19, 1986, authorizing Egg City to reduce wages by $2.00 per hour on the wages effective at the beginning of bankruptcy. In addition, the bankruptcy court authorized Egg City to reject the remaining terms of the previously expired Collective Bargaining Agreement with the UFW by Order entered on September 10, 1986.

After Egg City filed the bankruptcy petition, the UFW sought information from Egg City regarding its financial stability and ability to pay its workers. The UFW requested financial information, by letter dated June 6, 1986, which included a specific request for the "total number of non-bargaining unit personnel, total salary cost, total benefit cost, and any provisions for severance pay, termination benefits, and/or 'golden parachutes.'" Egg City responded on July 1, 1986, by providing the UFW with a 1985 Tax Return and unaudited financial statement. Egg City's response did not include a list of non-bargaining unit personnel.

On or about June 10, 1986, Egg City filed an unfair labor practice charge against the UFW with the NLRB for UFW conduct in April of 1986, which allegedly violated NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4). On April 24, 1986, the UFW engaged in a one day work stoppage. The NLRB dismissed the charge making no finding on the UFW's status, and concluding that the activity complained of would not violate § 8(b)(4) of the NLRA.

In June of 1986, the UFW began a lengthy campaign of strike activity directed against Egg City. The UFW members engaged in an economic strike at the Egg City operation, and picketed and distributed leaflets at various restaurants, grocery stores, and at the businesses of other users of Egg City products. Between June and September of 1986, Egg City advised the striking workers, the UFW, and the Unemployment Insurance Appeals Board that the striking workers had been permanently replaced.

On September 6, 1986, Egg City filed a second unfair labor practice charge with the NLRB. Case No. 31–CC–1866. A complaint was issued on October 3, 1986 by the NLRB. On November 21, 1986 a settlement agreement was executed between the NLRB and the UFW. The settlement agreement did not conceed any violation of the NLRA or labor organization status. In addition, the UFW disclaimed any interest in representing non-agricultural workers and requested an administrative determination of what Egg City work was agricultural. Egg City appealed the settlement and withdrawal of the complaint on the grounds that the UFW's disclaimer was ineffective. The NLRB determined that further proceedings were unwarranted and denied the appeal on April 9, 1987.

In late October 1986, an agent from the NLRB toured the Egg City operation to make administrative determinations on the work performed in light of evidence that Egg City was processing outside producers' eggs. On November 6, 1986, the Regional Director for Region 31 of the NLRB administratively determined that certain classifications of employees at Egg City were "employees" within the meaning of the NLRA § 2(3), 29 U.S.C. § 152(3). After the determination, the UFW again disclaimed any interest in representing non-agricultural workers.

On or about October 20, 1986, Egg City also filed an unfair labor practice charge with the ALRB alleging unlawful secondary boycotting activity. Case No. 86–CL–14–SAX(OX). The ALRB issued a complaint against the UFW based on Egg City's unfair labor practice charges. An administrative hearing was conducted, and on January 15, 1988, a decision was issued by an Administrative Law Judge. Egg City, the UFW, and the ALRB's General Counsel filed exceptions to the ALJ's decision.

Throughout the negotiation period, Egg City alleges that it informed the UFW that it was processing outside producers' eggs and therefore the workers processing these eggs were employees within the meaning of the NLRA. The UFW alleges that Egg City did not provide this information. Further, the UFW alleges that the first time it became aware of Egg City's contention that it was processing outside producers' eggs was in September of 1986, when the NLRB informed the UFW of Egg City's arguments in regard to its unfair labor practice charge.

The parties also disagree on the amount of outside producers' eggs that were processed, and the relevant time frame for measurement. Egg City alleges that the ALRB determined that 28% of the eggs processed at Egg City were from outside producers. 14 ALRB No. 2. In addition, Egg City argues that the relevant time frame for determining the classification of workers is a 12–month period. The UFW alleges that Egg City's processing of outside producers' eggs during the period of the alleged illegal secondary boycotting activity was deminimus. Specifically, the UFW alleges that from July to November 1986, Egg City's total egg sales were 632,944 cartons and the number of cartons of outside producers' eggs processed at Egg City was 2,114, or .003% of total sales.

Finally, the UFW alleges that Egg City paid all of its workers as exempt agricultural workers for purposes of overtime compensation requirements pursuant to the Fair Labor Standards Act (hereinafter "FLSA") until 1987. Specifically, Egg City paid workers in job classifications the NLRB Regional Director's November 6, 1986 letter administratively determined to be NLRB § 2(3) employees, and workers determined to be agricultural, time-and-a-half in overtime after 10 hours in a single day or 52 hours in a single workweek. After January 7, 1987, Egg City began paying time-and-a-half in overtime after 8 hours in a single day and 40 hours in a single workweek, to workers in job classifications the NLRB Regional Director administratively determined to be NLRA § 2(3) employees, and continued to pay workers in classifications the Director determined to be agricultural overtime after 10 hours in a single day and 52 hours in a single workweek. Egg City does not dispute these allegations.

## II. PARTIES' CONTENTIONS

Egg City filed the instant action on August 29, 1986, pursuant to NLRA § 303, 29 U.S.C. § 187, to recover damages for defendant's alleged unfair labor practices in violation of NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4). Egg City alleges that during the period of June 24, 1986 through and including March of 1987, the UFW engaged in specific conduct including picketing, threats to picket, and boycotting. Egg City further alleges that the UFW's activity was aimed at coercing neutral employers to stop doing business with Egg City, and therefore such activity constitutes secondary boycotting prohibited by NLRA § 8(b)(4)(i) and (ii)(B), 29 U.S.C. § 158(b)(4)(i) and (ii)(B).

The UFW argues that the Court lacks subject matter jurisdiction over the instant action because it only represents agricultural workers whose conduct is not covered by the NLRA. The UFW contends that the doctrine of equitable estoppel bars Egg City from asserting that it processed sufficient outside producers' eggs to transform its processing plant from an agricultural to a commercial operation. Specifically, the UFW argues that Egg City knew it was processing outside producers' eggs, that Egg City intended for the UFW to rely on its status as an agricultural union, that the UFW did not know Egg City was processing outside producers' eggs, and that the UFW relied on Egg City's silence to its detriment. In addition, the UFW argues that it disclaimed interest in representing non-agricultural workers when it was determined by the Regional Director of the NLRB that certain job classifications at Egg City were commercial. Moreover, the UFW argues that Egg City had a duty to notify it of the change in status because of the Recognition clause in the Collective Bargaining Agreements and California law. The UFW also alleges that all of Egg City's workers were paid as exempt agricultural workers for purposes of overtime compensation requirements pursuant to the FLSA. The UFW argues that Egg City cannot treat workers as agricultural for purposes of overtime compensation and at the same time claim that such workers are NLRA employees for the purpose of establishing jurisdiction in the instant action.

In its motion for partial summary judgment, Egg City argues that the UFW is a labor organization within the meaning of NLRA § 2(5) and that therefore, the Court has subject matter jurisdiction over the instant action. Egg City alleges that the ALRB determined that the UFW represented NLRA § 2(3) employees, and that this determination is entitled to res judicata or collateral estoppel effect. Case No. 86–RD–6–SAL, 14 ALRB No. 2. In addition, Egg City alleges that the NLRB determined that a majority of Egg City's job classifications were commercial positions, and that the UFW represented the employees in these classifications. Further, Egg City argues that these ALRB and NLRB decisions are correct because "employees who perform *any regular amount* of non-agricultural work are covered by the [National Labor Relations] Act." *Olaa Sugar Co., Ltd.*, 118 NLRB No. 195 (1957). Moreover, Egg City argues that it is appropriate for the Court to examine the entire membership of the union when determining whether or not it is a labor organization. *International Organization of Masters, M. & P. v. NLRB*, 351 F.2d 771, 775 (D.C. 1965). Finally, Egg City argues that the UFW admitted it is a labor organization by submitting to the jurisdiction of the NLRB.

In its opposition to the UFW's motion for summary judgment, Egg City argues that summary judgment on the grounds of equitable estoppel is not appropriate because there is a material issue of fact whether the UFW had knowledge before the strike and boycott activity that Egg City's employees were potentially commercial and not agricultural. In addition, Egg City argues that equitable estoppel is not appropriate as a jurisdictional defense. Further, Egg City argues that equitable estoppel is not appropriate because UFW has unclean hands. Egg City alleges that the UFW's alleged illegal secondary boycotting activity, even if not covered by the NLRA, would still be illegal under California tortious interference with contract relations law. Moreover, Egg City argues that equitable estoppel is not appropriate because Egg City had no duty to inform the UFW it was processing outside producers' eggs, and the UFW has not presented evidence of reliance. Finally, Egg City argues that the overtime payment of its workers pursuant to FLSA requirements is irrelevant to whether these workers are NLRA employees.

### III. AGRICULTURAL WORKERS AND LABOR LAW

■ The determination of whether the UFW and its members are a labor organization and employees within the meaning of NLRA § 2(3), (5), 29 U.S.C. § 152(3), (5), is critical to the resolution of the instant action. This is so because agricultural un-

ions and workers are not subject to the secondary boycotting prohibitions of NLRA § 8(b)(4), 29 U.S.C. § 158(b)(4).

NLRA § 303(a), 29 U.S.C. § 187(a), provides a cause of action for damages suffered as a proximate result of a labor organization's violation of NLRA § 8(b), 29 U.S.C. § 158(b). NLRA § 8(b), 29 U.S.C. § 158(b), provides that "[i]t shall be an unfair labor practice for a labor organization or its agents—" to engage in conduct listed in the subdivisions that follow. Conduct constituting secondary boycotting is one of the unfair labor practices prohibited by NLRA § 8(b), 29 U.S.C. § 158(b). NLRA § 303(b), 29 U.S.C. § 187(b) provides that whoever shall be injured in their business or property, by reason of any such unfair labor practice may sue for damages.

Labor organization is defined by NLRA § 2(5), 29 U.S.C. § 152(5), as "any organization of any kind, ... in which employees participate and which exists for the purpose, ... of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." Employee is defined by NLRA § 2(3), 29 U.S.C. § 152(3) as "any employee, ... and ... any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, ...." Thus, the NLRA prohibits certain conduct by labor organizations but does not govern the conduct of agricultural unions. *See Di Giorgio Fruit Corp. v. NLRB*, 191 F.2d 642, 647 (D.C.Cir.1951) *cert. denied*, 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653 (1951). Agricultural laborers were excluded from the NLRA because at the time the NLRA was enacted, Congress did not perceive a need for collective bargaining among agricultural workers. *See North Whittier Heights Citrus Ass'n v. NLRB*, 109 F.2d 76 (9th Cir.1940) (stating that conditions causing strikes would not obtain for agricultural workers in traditional farm setting).

Agriculture is defined in § 3(f) of the FLSA, 29 U.S.C. § 203(f), as:

farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities ... the raising of livestock, bees, furbearing animals, or poultry and any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

This definition contains two branches: 1) primary agriculture, where the work itself is inherently agricultural, and 2) secondary agriculture, where the work is done by a farmer or on a farm and is incidental to the farming operation. *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762–63, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672 (1949). To determine whether a particular type of activity is agricultural, "[t]he question is whether the activity ... is carried on as part of the agricultural function or is separately organized as an independent productive activity." *Id.* at 761, 69 S.Ct. at 1278.

In analogous cases, the NLRB has ruled that where a farmer regularly processes significant quantities of other producers' commodities, the processing plant workers are not performing incidental agricultural labor, and are therefore employees within the meaning of NLRA § 2(3), 29 U.S.C. § 152(3). *Employer Members of Grower-Shipper Vegetable Ass'n*, 230 NLRB No. 150 (1977) (processing 10% or less of outside producers' produce insufficient to establish NLRB § 2(3) status); *John C. Mauer & Sons*, 127 NLRB No. 161 (1960) (processing 8% of outside producers' produce insufficient to establish NLRB § 2(3) status).

In addition to exclusion from the provisions of the NLRA, agricultural workers are also exempt from the FLSA minimum overtime compensation requirements. FLSA § 7(a)(1), 29 U.S.C. § 207(a)(1), requires time-and-a-half overtime pay for any

work performed beyond 8 hours in a day and 40 hours in any workweek, but § 13(b)(12), 29 U.S.C. § 213(b)(12) exempts workers employed in agriculture from the overtime requirement.

Courts have ruled that whether the agricultural exemption applies depends on both the nature of the farm and the amount of processing of outside producers' produce. *Wirtz v. Tyson's Poultry, Inc.*, 355 F.2d 255 (8th Cir.1966); *Sweetlake Land & Oil Co. v. NLRB*, 334 F.2d 220 (5th Cir.1964). In *Wirtz*, the court held that the agricultural exemption applied to workers in the employer's egg processing operation, even though 27% of the eggs processed were from outside contract growers. The *Wirtz* court found that "[t]he egg-processing business was completely integrated with appellees' activities in providing birds and necessary supplies in marketing eggs." *Wirtz*, at 261. In *Sweetlake Land & Oil Co.*, the court held that the agricultural exemption did not apply when 20% of the rice processed belonged to tenant farmers and the activity of drying the rice was not a part of the employer's farming operation. *Sweetlake Land & Oil Co.*, at 223.

Although agricultural workers are not covered by the NLRA, they are covered by the ALRA, enacted by the California Legislature in 1975. The ALRA defines the term agriculture in accordance with FLSA § 3(f), 29 U.S.C. § 203(f). Cal.Lab.Code § 1140.4(a). The ALRA defines agricultural employees in terms of the workers excluded from the NLRA's coverage. Cal. Lab.Code § 1140.4(b). Section 1140.4(b) provides:

> The term "agricultural employee" or "employee" shall mean one engaged in agriculture, as such term is defined in subdivision (a). However, nothing in this subdivision shall be construed to include any person other than those employees excluded from the coverage of the National Labor Relations Act, as amended, as agricultural employees, pursuant to Section 2(3) of the Labor Management Relations Act (Section 152(3), Title 29 United States Code), and Section 3(f) of the Fair Labor Standards Act (Section 203(f), Title 29 United States Code).

## IV.  EQUITABLE ESTOPPEL

The doctrine of equitable estoppel adjusts the relative rights of parties based upon consideration of justice and good conscience. *United States v. Georgia–Pacific Co.*, 421 F.2d 92, 95 (9th Cir.1970). Equitable estoppel prohibits a party from assuming inconsistent positions to the detriment of another party. *Id.* at 96. Further, a party's silence will work an estoppel, if under the circumstances, the party has the duty to speak. *Id.* at 97. Finally, "equitable estoppel is a rule of justice which, in its proper field, prevails over all other rules." *Id.* at 96.

Four elements are required to establish the defense of equitable estoppel. Equitable estoppel requires the following:

> (1) The party to be estopped must know the facts;  (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;  (3) the latter must be ignorant of the true facts; and (4) he must rely on the conduct to his injury.

*United States v. Wharton*, 514 F.2d 406, 412 (9th Cir.1975) (quoting *Georgia–Pacific*, at 96).

The doctrine of estoppel is applicable in labor relations and in pension benefits cases. *Terones v. Pacific States Steel Corp.*, 526 F.Supp. 1350 (N.D.Cal.1981) (citing *Amalgamated Clothing and Textile Workers Union v. Ratner Corp.*, 602 F.2d 1363 (9th Cir.1979)). However, the equitable estoppel defense was rejected in *Newspaper Drivers & Handlers Local 372 v. NLRB*, 735 F.2d 969 (6th Cir.1984).

In *Newspaper Drivers*, the issue presented to the court was whether an employer can be equitably estopped from claiming that workers previously recognized as "employees" under NLRA § 2(3), 29 U.S.C. § 152(3), are actually supervisors and thus not covered by the NLRA. *Id.* at 970. Beginning in 1970 and continuing until 1976, the employer recognized its district managers as employees within the meaning of the NLRA. *Id.* Then in 1976 when the

current bargaining agreement was about to expire, the employer reversed its position and refused to bargain with the union, claiming that the district managers were actually supervisors and therefore not entitled to coverage under the NLRA. *Id.*

The *Newspaper Drivers* court held that equitable estoppel could not be asserted to prevent the employer from challenging the status of the district managers because the purpose of the NLRA would be frustrated. *Id.* at 971. Specifically, the court found that Congress intended recognition of supervisors by employers for bargaining purposes to be completely voluntary. *Id.* Further, the court found that the purpose of the voluntary rule was to ensure "that no one, whether employer or employee, need have as his agent [i.e., supervisor] one who is obligated to those on the other side, or one whom, for any reason, he does not trust. *Id.* (quoting H.Rep. No. 245, 80th Cong., 1st Sess. 17 (1947)). However, the court went on to find that prior conduct of the employer with regard to treatment of workers is significant evidence as to the proper classification of workers, although it is not determinative. *Id.*

## V. ANALYSIS

In general, courts have ruled that summary judgment is an inappropriate vehicle for raising a question concerning the court's subject matter jurisdiction. *O'Donnell v. Wien Air Alaska, Inc.,* 551 F.2d 1141, 1145 n. 4 (9th Cir.1977). Rather, motions suggesting a lack of subject matter jurisdiction should be raised by motions under Rule 12(b) of the Federal Rules of Civil Procedure. *Id.* at 1144–45 n. 3. However, some courts have entered summary judgment on jurisdictional grounds. *See Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1253–54 (9th Cir.1976).

The rationale for this distinction is that if the court has no jurisdiction, it has no power to enter a judgment on the merits and must dismiss the action. In addition, a dismissal and summary judgment have different effects; a dismissal for lack of subject matter jurisdiction has no res judicata effect, whereas a summary judgment is on

the merits and purports to have such effect. 5 *Wright & Miller, Federal Practice and Procedure* § 1350 (1960). Further, the court's role on the two motions also is different. On a motion attacking the court's jurisdiction, the district judge may resolve disputed jurisdictional fact issues. *Berardinelli v. Castle & Cooke Inc.,* 587 F.2d 37, 39 (9th Cir.1978). On a summary judgment motion, the district judge determines whether any issues of material fact exist that require trial. Fed.R.Civ.P. 56(c).

In *Berardinelli,* the district court dismissed an antitrust action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Berardinelli,* at 38. The district court found, on the basis of the pleadings, supplemental briefs, affidavits, and other materials, that the business activities involved were "not within the flow of interstate commerce but ... rather wholly intrastate in character [and these] intrastate activities [did] not substantially affect interstate commerce." *Id.* The Court of Appeals affirmed the dismissal and held that it is proper for a district judge, rather than a jury, to decide the disputed factual questions concerning jurisdiction where the jurisdictional issue depends on facts that are separate and distinct from the facts on the merits of the case. *Id.* at 38–39. The Court of Appeals found that the jurisdictional question was whether the defendants' conduct had a sufficient relationship to interstate commerce, while the substantive issue was whether the defendants participated in anticompetitive conduct. *Id.* at 38. Further, the Court of Appeals held that it was proper for the district court to rely on affidavits and other evidence submitted in connection with the case in reaching its decision. *Id.* at 39.

In the instant action, the Court will treat the UFW's summary judgment motion as a motion to dismiss for lack of subject matter jurisdiction pursuant to 12(b)(1) of the Federal Rules of Civil Procedure. Subject matter jurisdiction may be challenged at any stage in the proceedings. Fed.R.Civ.P. 12(h). In addition, the Court finds that the jurisdictional question presented is whether

the UFW is a labor organization within the meaning of the NLRA, and the substantive question is whether the UFW violated the secondary boycotting prohibitions of the NLRA. The Court finds that these questions are separate and distinct, and therefore it is proper for the Court to resolve disputed questions of fact on the issue of jurisdiction. In connection with this motion, the Court considers the parties' motion papers, the declarations, exhibits and depositions submitted in connection with the motions, and the oral argument of counsel.

■ First, the Court finds that the doctrine of equitable estoppel is applicable in the instant action. Equitable estoppel has been applied in the labor context by Ninth Circuit courts. In addition, the Court finds that the legislative history of the agricultural laborer exemption from coverage by the NLRA will not be frustrated by the application of the doctrine of equitable estoppel. Congress did not include agricultural workers within the coverage of the NLRA because it did not perceive that agricultural workers were in need of such coverage. In the instant action, there is no sensitive issue of "trust" as in the *Newspaper Drivers* case.

Second, the Court finds that all elements of equitable estoppel are met. Specifically, the Court finds that the processing of outside producers' eggs was particularly within Egg City's knowledge, discretion and control. In addition, the Court finds that Egg City intended for the UFW to rely on its perceived status as an agricultural union. Egg City did not avail itself of numerous opportunities to inform the UFW of the alleged change in status of the union and its members. Throughout the bargaining process, Egg City did not propose changes to the Recognition clause of the expired agreement. Further, when the UFW requested the names of non-bargaining unit workers at the newly acquired Fairview Ranch, Egg City did not assert its claim concerning the commercial nature of the main operation, but rather assured the UFW that the Fairview Ranch workers were handling Egg City's products exclu-

sively. Moreover, the Court finds that Egg City had a duty to notify the UFW of information relevant to the composition of the bargaining unit. *Queen Mary Restaurants v. NLRB*, 560 F.2d 403 (9th Cir.1977); *Cardinal Distributing Co. v. ALRB*, 159 Cal.App.3d 758, 767, 205 Cal.Rptr. 860 (1984).

Third, the Court finds that the UFW was ignorant of the true facts. The Court disagrees with Egg City's contention that its filing of the decertification petition with the NLRB was sufficient to alert the UFW that a change in its status had occurred. To the contrary, the Court finds that the NLRB ruling reinforced the UFW's position as the certified bargaining agent for agricultural workers pursuant to the ALRB. The ALRB certification describes a group of workers inherently excluded from NLRB coverage. Further, the Court finds it reasonable for the UFW to rely upon Egg City's continued proposal of the Recognition clause in the expired collective bargaining agreement, and Egg City's response concerning the bargaining unit accretion issue, to indicate that no change had occurred in the operation of the farm. Based on the foregoing, the Court finds that the UFW became aware of the possibility of outside egg processing and changes in the bargaining unit when the NLRB informed the UFW in September of 1986, of Egg City's contentions in regard to the unfair labor practice charges then pending. Finally, upon learning of Egg City's contentions regarding purchasing of outside producers' eggs, the UFW disclaimed any interest in representing non-agricultural workers.

Fourth, the Court finds that the UFW relied to its detriment upon Egg City's failure to notify it of changes in the nature of the farming operation. The UFW engaged in strike and boycott activity under the belief it was not a labor organization within the meaning of the NLRA, and therefore not subject to the NLRA prohibitions. The withholding of information about processing outside producers' eggs subjected the UFW to additional potential liability under the NLRA that it did not otherwise have.

Finally, the Court finds that throughout the time that Egg City contends its workers were NLRA § 2(3), 29 U.S.C. § 152(3), employees, it paid these workers as exempt agricultural workers for purposes of overtime compensation requirements pursuant to the FSLA. While Egg City previously claimed that its processing plant workers were agricultural and therefore exempt from the minimum overtime compensation requirements of the FSLA, it now claims that these workers are NLRA employees in order to establish a cause of action under the NLRA. Egg City cannot have it both ways. The Court finds that Egg City's treatment of its workers as agricultural in terms of overtime compensation, and its silence to the UFW concerning the processing of outside producers' eggs estops Egg City from asserting a cause of action under the NLRA in the instant action.

The Court finds that the UFW is not a labor organization within the meaning of the NLRA. Therefore, the Court lacks subject matter jurisdiction over the instant action.

Accordingly, the Court dismisses the instant action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.